**Vivian KUCHNER f/d/b/a Equity Real Estate, Plaintiff–Respondent,**

v.

**Robert P. SHEPPARD, et al., Defendants–Appellants.**

No. ED 79540.

Missouri Court of Appeals, Eastern District, Division Four.

Oct. 15, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 18, 2002.

Application for Transfer Denied Jan. 28, 2003.

Michael A. Wolff, St. Louis, MO, for appellant.

Michael Waxenberg, St. Louis, MO, for respondent.

LAWRENCE E. MOONEY, Judge.

Vivian Kuchner, a real estate broker, sued her former client, Robert Sheppard, for the balance she claimed was still due her as a commission pursuant to exclusive listing contracts they had executed. After trial, the judge entered judgment on a jury verdict awarding the broker $85,850, and Robert Sheppard, the seller, has appealed. We find a single issue dispositive of this appeal. Because we hold that the broker's claims should be barred because she failed to comply with the rules of the Missouri Real Estate Commission, we reverse the judgment.

## BACKGROUND

Robert Sheppard and his siblings owned and resided on adjacent parcels of land located on Craig Road in St. Louis County. Robert Sheppard and his brother, Arnot, owned ten-plus acres located at 1018 Craig Road, and had lived there since 1953. Laura Sue Roennfeldt, the sister of Robert and Arnot Sheppard, owned just over one acre of land located at 1120 Craig Road, where she and her husband had lived since about 1965.

Vivian Kuchner was a neighbor of the Sheppards and the Roennfeldts. Over the 30 years that they were neighbors, a close friendship developed between Vivian Kuchner and Robert Sheppard and his sister, Laura Sue Roennfeldt. Vivian Kuchner considered Laura Sue Roennfeldt to be like an aunt. Robert Sheppard and Laura Sue Roennfeldt both named Vivian Kuchner as their attorney-in-fact under durable powers of attorney.[1] Vivian Kuchner was also named as a beneficiary under both Robert Sheppard's and Laura Sue Roennfeldt's trusts.[2] Vivian Kuchner's daughter was also named as a beneficiary under Laura Sue Roennfeldt's trust.

Vivian Kuchner first took real estate licensing courses in 1979, and was then employed as a sales associate by three different companies, primarily listing residential properties. She received her real estate broker's license in 1983. In 1987, about a year after Vivian Kuchner had become an independent broker, Robert Sheppard and his siblings approached her and entered into exclusive listing agreements with her for the sale of their properties. These listing agreements, renewed on a yearly basis, listed the properties at $10 per square foot, making the total listed

---

1. Robert Sheppard's durable power of attorney, naming Vivian Kuchner as attorney-in-fact, has since been revoked.

2. Robert Sheppard's trust, naming Vivian Kuchner as a beneficiary, has since been revoked.

sale price for the two properties over $4,000,000. The listing agreements provided that Vivian Kuchner, as the listing agent, was entitled to a 10% sales commission upon the sale of the properties, to be paid at closing.[3] Thirteen offers were made between 1987 and 1996, but for various reasons, including developers' failed attempts to have the property re-zoned, the properties did not sell.

Robert Sheppard renewed the listing agreements on New Year's Day, 1996.[4] The terms of these listing agreements were similar to the prior agreements.[5] The 1996 agreements again entitled Vivian Kuchner, as the listing agent, to a 10% sales commission upon the sale of the properties. A change in the sale price was made from earlier agreements; the sale price was now listed at $8 per square foot, making the total listed price of the two properties $3,484,800.

The listing agreements for the sale of the Craig Road properties were far and away Vivian Kuchner's most valuable listings. Vivian Kuchner had never sold a ten-acre parcel before, nor had she ever sold a million-dollar parcel of land. And, she had never charged, or received, a 10% commission. The largest commission she had ever received was a 7% commission. And, during the period of time from 1987 to 1996, Vivian Kuchner earned a sum total of $46,000 in commissions. Yet, if the two properties sold at the listed price, according to the terms the 1996 agreements, Vivian Kuchner would have re-

ceived a total sales commission of $348,480, less any amount due to a buyer's broker. She did not tell Robert Sheppard that she had never charged a 10% commission before, nor did she inform him of the standard rate. Vivian Kuchner only discussed a general range of 6–10% as a commission with Robert Sheppard and his siblings at the time of the original listing agreement. This was Robert Sheppard's first, and only, experience in selling real estate.

Vivian Kuchner's marketing efforts included placing small advertisements in the St. Louis *Business Journal* and the St. Louis *Post–Dispatch*, listing the properties in the Multi–Listing Service, and also writing personal letters to a number of owners and developers of commercial properties.

On November 15, 1996, Robert Sheppard entered into a sales contract with C.J. Partners, L.P. for the sale of the two properties. Vivian Kuchner played no role in negotiating these contracts, and was not present when the contracts were signed. The sale prices reflected a selling price of around $3 per square foot, substantially lower than the asking price of $8 per square foot. The sale price for 1120 Craig Road was $100,000, and the sale price for 1018 Craig Road was $1,600,000. With respect to the 1018 Craig Road property, Robert Sheppard and the buyer agreed to defer payment of half the sales price for one year.

Closing took place on January 31, 1997. The settlement statements reflect the

---

3. The agreements also provided that any fee for a buyer's broker would come out of this commission.

4. Robert Sheppard was acting on behalf of himself, as trustee of his sister's trust, and executor of his brother's estate. Robert Sheppard's sister, Laura Sue Roennfeldt, and her husband, both passed away in 1994. Robert Sheppard became the trustee of Laura Sue Roennfeldt's trust, which included the proper-

ty at 1120 Craig Road. Robert Sheppard became the executor of his brother Arnot Sheppard's estate after Arnot Sheppard's death in 1995.

5. The listing agreements were for a period of one year, to December 31, 1996, which Robert Sheppard later extended to February 1, 1997.

above sale prices and terms, and payment was made in accordance to these terms. The settlement statements, reviewed by Vivian Kuchner, also provided for a total sales/broker's commission at the rate of 6% of the sale prices, not the 10% commission as stated in the listing agreement. In accordance with this 6% commission, Vivian Kuchner received a total of $68,000–$4,000 from the sale of 1120 Craig Road, and $64,000 from the sale of 1018 Craig Road.[6]

Vivian Kuchner claims that prior to closing, she and Robert Sheppard orally agreed that payment of the unpaid portion of her 10% commission, less an allowance of 2% of the sale prices for the buyer's broker, was also to be deferred for a period of one year. Robert Sheppard claims that this is an entire fiction, and that the 6% commission paid at the closing, again subject to the same allowance for the buyer's broker, represented the full commission on the properties.

After a year passed without payment, Vivian Kuchner filed suit to recover the balance due on her claimed commission. After trial, the jury returned verdicts for the broker, Vivian Kuchner, and Robert Sheppard now appeals the judgment entered on the verdict.

## DISCUSSION

Robert Sheppard, the seller, asserts error in the trial court's denial of his motions for directed verdict and judgment notwithstanding the verdict. He argues that because the broker's claims are based on alleged oral modifications of listing agreements and closing statements required by Missouri Real Estate Commission rules to be both accurate and in writing, the claims violate public policy and should not be enforced. The seller points out: (1) a listing agreement must be in writing, containing all the terms and conditions of the agreement, including the commission to be paid, and must be signed by the parties; that a broker must review the listing agreement for its accuracy; and that any change to the listing agreement must be initialed by the parties, 4 C.S.R. 250–8.090(3)(A) and (C); (2) that a broker must give the seller a complete, accurate, and detailed closing statement showing all material financial aspects of the transaction, 4 C.S.R. 250–8.150(1); and (3) that a broker is responsible for reviewing the closing statement to verify its accuracy, 4 C.S.R. 250–9.150(2). The seller urges that, because the broker failed to abide by these rules, we should find that the broker's claims are barred as violating public policy.

The provisions of Chapter 339, regulating real estate agents and brokers, were enacted for the purpose of protecting the public against fraud and incompetence in real estate transactions. *Sandbothe v. Williams*, 552 S.W.2d 251, 255 (Mo.App. 1977); *See also Coldwell Bankers–Gordon Co. Realtors v. Roling*, 703 S.W.2d 572, 576 (Mo.App. W.D.1986). The rules of the Missouri Real Estate Commission were promulgated under a grant of authority set forth in Chapter 339. We note that there is nothing in the statutes or the rules that makes a transaction void and illegal for a broker's failure to comply with 4 C.S.R. 250–8.090, 4 C.S.R. 250–8.150, or 4 C.S.R. 250–9.150(2). However, "sometimes courts will inquire how far and for what reason a transaction is prohibited as wrongful." *Roling*, 703 S.W.2d at 576 *citing* 6 Willi-

---

**6.** At 6%, the commission totaled $102,000. The amounts received by Vivian Kuchner reflect 4% of the sale prices. The remaining 2% of the sale prices ($34,000) was paid to the buyer's broker.

ston on Contracts (Rev.Ed.) p. 5006, § 1784.

The case of *Roling* is instructive. The broker in that case contacted the lessee prior to having a written listing agreement in effect, and did not have an explicit listing agreement detailing all of the terms under which the property was to be leased, nor did the listing agreement contain all the required signatures, all in violation of 4 CSR 250–9.090(1) and (2). Though the court found that the broker had technically violated the public policy established by the regulations, the court conducted a fact-sensitive inquiry into whether the broker's failure to comply with the real estate commission regulations should void the contract and bar the broker's claims for commission. The court first noted that there was no evidence that the defendant lessor was "misled, overreached or prejudiced by [the broker's] failure to comply with the Real Estate Commission's rules and regulations, or that there was a misunderstanding." *Roling*, 703 S.W.2d at 575. The court further noted that there had been a further detailed documentation of the provisions to be included in the lease, and that the defendants had benefited by broker's services, while the broker stood to lose its entire commission. *Id.* In its final analysis, with there being no evidence of fraud or misconduct, and in balancing the loss to the broker against the purpose of the statutes and regulations in the declared public policy to prevent fraud and incompetence, the court held that under the particular facts of the case the broker should not forfeit its earned commission "by reason of the technical *initial* failure to have an adequate listing agreement." *Roling*, 703 S.W.2d at 576 (emphasis in original).

Here too, we are presented with violations of the rules of the Missouri Real Estate Commission. Without doubt, the listing agreement, which provided that a 10% commission would be paid at closing, was not changed to reflect either that payment of one-half of the broker's commission was to be deferred for a year, or that the commission was to be reduced to 6%. And, the closing statement, which was required to be complete, accurate, and detailed, showing all material financial aspects of the transaction, and which was the broker's responsibility to provide and review for accuracy, reflected only a 6% commission. There was no indication that any portion of the broker's commission was to be deferred for a year. The broker did not comply with the rules, and thus, as was found in *Roling*, she violated the public policy established by the statutes and rules.

We are left with the question of whether the broker's claims should be barred because of these violations. We hold that they should. Given the facts of this case, and in balancing the loss to the broker against the purpose and public policy of the statutes and rules, protecting the public against fraud and incompetence in real estate transactions is far more important than any loss the broker might suffer in this case. Unlike in *Roling*, where the broker had received no commission for its services, the broker here received a substantial commission, a 4% commission totaling $68,000. The broker in this case is claiming an additional $68,000 based on a 10% commission on property which was sold at far below the listed price. But, most importantly, in seeking amounts due on a 10% commission, the broker claims that she and the seller agreed that payment of the unpaid portion of her 10% commission was to be deferred for a period of one year, yet there is no document of agreement, and the closing documents, to the contrary, affirmatively represent that the commission was 6%, not 10%.

The statutes regulating real estate agents and brokers were enacted to protect the public against fraud and incom-

petence in real estate transactions. Part and parcel of this are the requirements that terms of a real estate transaction be in writing, that changes to a listing agreement be initialed by the parties, and that closing statements be complete, accurate, and detailed, showing all material financial aspects of the transaction. Without such requirements, a person may be left unprotected from alleged promises or agreements that were never made. A real estate closing should not only conclude a transaction between a seller and buyer, but should also conclude a transaction between a seller and his broker. There must be, after all, a reason that it is called a closing.

The judgment is reversed.

SHERRI B. SULLIVAN, P.J., and LAWRENCE G. CRAHAN, J., concur.